We will hear argument first this morning in Case 13-502, Reed v. Town of Gilbert. Mr. Cortman. Mr. Chief Justice, and may it please the Court, the Town's Code discriminates on its face by treating certain signs differently based solely on what they say. For example, political signs may be 32 square feet, may be unlimited in number, and may be placed in the right-of-way of the entire town for five months before the election. But the Church's signs can only be one-fifth of that size, only placed in the dark of night, the night before the Church service. While the Church's signs with directional content are only allowed up for 14 hours, other signs with directional content are allowed up for much longer. For example, builders' directional signs to home sales events are allowed up to be the entire entire weekend, and homeowners' association event signs are allowed to be up for 30 days. Ginsburg. What are you seeking? Do you want whatever is the most favorable rule, say, for ideological signs, is that what you want, or do you accept that there could be some limit on event signs, say, some reasonable time limit? We're seeking the same as the favorable signs, which in this case would be both ideological and political signs. And the reason that I think the ideological isn't time-limited. Well, but it's not allowed on the right-of-way, and so that's a major factor in this case, because political signs are allowed on the right-of-way. And so the treatment that we're seeking is merely equal treatment under the First Amendment. The same treatment as political signs, is that? The same treatment as political signs that are allowed up in the right-of-way, that's right. And ideological signs, interestingly enough, are still based into their own content category, but they're not allowed on the right-of-way, yet they are allowed up for an unlimited period of time. Are you seeking unlimited placement? We are not. We are seeking the same placement that any other temporary signs get, which is the category that we're talking about. And in fact, the city, the town here has freedom to regulate the amount of times signs can go up, the size of the signs, the number of the signs. All our argument is, is that they do it across the board and not treat signs differently based on their content. Your argument does not turn on the fact that it's a church's sign, does it? I mean, your argument would be the same if this was a temporary sign about where the soccer game was going to be. Well, that's right. And the church's sign merely adds additional components to it. For example, the town puts our church's sign into a category called directional signs, but yet the church's sign has religious speech on it, it has obviously directional speech, it has ideological speech, but that's correct. It's equal treatment for that type of sign. And the category of the church's sign is the same as the church's sign. Kagan. Can I ask about the category for political signs, which is the most favorable? Because all the time this Court says that political speech is the most valued kind of speech, it's at the heart of the First Amendment, it gets special First Amendment protection. So in a way, why aren't — isn't the locality here basically adopting the same kind of category-based understanding of political speech and its special role in First Amendment analysis that this Court has very frequently articulated? Well, I think this Court has also said, for example, that religious speech also handles that category of core speech under the First Amendment. And the problem is, is what the town does here, it's valuing speech. And I think that's one of the problems. It is saying that political speech in this case is more valuable than an invitation to church. And so I think this Court has made clear that the government's role in the First Amendment is more valuable than the church's role in the First Amendment. Roberts. I'm sorry. That was the significance of my prior question. What they're really saying is that political speech is more valuable than speech about where the soccer game is. In other words, I thought you indicated that your argument did not depend on the fact that the sign was a sign for the church. Well, that's right. It doesn't depend on that fact. I was merely referring to the facts of this case. I apologize. Don't you think that political speech is more valuable than directions to the soccer game? Maybe in some people's eyes, but the problem we have is, is should the government be deciding what speech is more valuable than others, because that's exactly what it did in this case. It has said that, in fact, your speech is not valuable and we can completely ban it. And I think one of the problems is that— Well, let's take a sign that in all other ways is equal, except that it says no signs on residential property except properties that are being sold. And so it's valued the homeowner's right to sell its property. Would that be contrary to the First Amendment? And if not, why is that value any different than valuing political speech? I think it would be. I think this Court's case in Lindmark dealt with a similar circumstance, where in that city it banned all residential signs except for – in fact, it was the reverse. It banned for sale signs and allowed some residential signs. There were exceptions. But this Court said exactly that, that the town shouldn't value different types of speech, especially on private property, when you have homeowner's rights that also comes into play in addition to speech. What if it's commercial and it relates to a one-time event, for example, for a yard sale? Right. If the State and the city allow election-related signs to be put up in the right of way, then anybody who has a yard sale has an equal right? Well, I think commercial speech under this Court's jurisprudence can be treated differently. And that's one of the important things. The category here is narrow. Because government speech, government can put up whatever signs that it would like. It doesn't trigger any problem under the First Amendment. We hear a lot in the other briefs about warning signs and other types of signs. The government is free to put up all the signs that it would like without triggering this problem. Commercial speech is also in a different category, according to this Court. So the narrow category that we're talking about is temporary signs, not permanent signs, that are put up in the right of way that can be regulated. Do you think directional signs is a valid category? The reason I don't think it is, is because here, the direction is part of the invitation to come and worship, or part of the invitation to come to a different event. So the directional part of it is in addition to the ideological speech, the invitation to come in and worship. And so although it appears to be a different category of directional, it's important to the speech of the Church, inviting the community in, saying, come worship with us, and here's where we're located. And what's interesting about that, if the Church, for example, says we're meeting now at Senior Living Center, that's considered to be a directional sign, because the definition is a sign that's intended to invite and direct someone to your service. That would then be banned in the right of way. Kennedy, I guess you see the concern. If an affluent person wants to celebrate a birthday, he can put happy birthday Uncle Fred as many places as a political sign and it's for long. Well, I think one of the issues is if the government has decided that its interest, which by the way is what drives this, the interest in safety and aesthetics, which are the two interests the government proposes, if those have already been deemed to be less important than speech, then I think speech should be allowed. But your answer to the question is happy birthday Uncle Fred can have as many signs and for as long as a political campaign. I think that's right. That has to be, it seems to me. What about a historical marker, the birthplace of James Madison or whatever? I think the answer to that is the government is free to put up that marker without any implications. No, it's private, it's privately owned. Well, I think if it's allowing private speech, then we engage in a problem of valuing. For example, in that case, we think that marker is more important than someone else's speech. So again, under your view, happy birthday Uncle Fred and save your soul and birthplace of James Madison can all be up for the same length of time, same size? I think it can, because otherwise I think we have a problem with content-based discrimination. And what about permanent signs? I assume that what you say about temporary signs would apply equally to permanent signs, wouldn't it? It would, but in a different category. In other words, our category that we're discussing is temporary signs, so ours wouldn't affect permanent signs. I believe you could make that's a content-neutral category. But if you had a permanent sign, I think within the permanent sign category, the answer is yes. Scalia, within the permanent sign category, they all have to have the same? I believe so, because Except commercial, I assume. And especially if most of the permanent signs are commercial signs, when we talk about billboards and other types of signs. So this Court, I think, has made clear if you have, for example, billboards and other permanent signs that do allow commercial speech, then the municipality must allow noncommercial speech. But what would happen if one church has a always meets in the same place, and it wants to put up a sign that says every Sunday, this is the place to go, and another church moves around, so it wants to put up a temporary sign, do they have to be treated the same? I think they would. If we're talking about the category of what goes on public property, what goes on the right-of-way. On their own property is a different question. But here the town has already decided to allow an unlimited number of political signs up to 32 square feet for nearly the entire year. There are four elections in Arizona, so with this time limit of five months, you have political signs in an unlimited number. And those signs affect the safety and aesthetics interest the same way as the church's sign does, the same way as an invitation. How do you create your temporary category without reading the sign? And so there is some force to the counterargument that what is being regulated here is not the content, but the function of the sign. So how do you get around that argument? Because you've already created a category that requires you to read the sign. I don't think it does. And the reason the way the temporary sign is defined here is merely a sign that's both intended and constructed not to be permanent. And so it doesn't matter what's on that sign. That's why we think that category is content neutral, because as long as it's a temporary sign, it doesn't matter what the sign says. A permanent sign is just duration. And there can be duration requirements, there can be size requirements, location  That, the government doesn't care. Roberts. Roberts. So your point is if it's stuck in the ground, you know, with a little stake, then it can be treated one way, but if it's in concrete. That's right. I mean, it seems to me that you're trying to find a, I don't know, a difficult way to deal with an issue that could be readily addressed just by seeing if the sign is for a limited event. In other words, what if somebody every time, every, you know, the stake in the ground basically lasts for three weeks. So every three weeks they come along and stick the stake back in the ground. You're saying the only way they can distinguish is by looking at whether it has a stake in the ground or whether it's in concrete. And yet that seems to me that doesn't help the, that doesn't answer the city's legitimate concern. But I think what's important here is that the city, the town has already agreed that an election is an event. And so we have an election that's an event, but yet that single event sign can be up for five months, and yet we have an event where that single event can only be up overnight. And so it's already made that determination that when it allows these types of signs for what I think is a comparable use, a single event to a single event. The other thing I would say is if you allow signs to be up for one single event for five months, certainly there should be some way to say, well, if we have a recurring event as we do here, certainly the sign should be allowed up at least equal to the same of time. And we're not going to say that an election is a single event in the same way as a football game, a cookout, a basketball championship. It seems to me it's a very difficult thing for this Court to have to say. It's just not the political campaign is a dynamic that goes on for some weeks that the signs initiate a discussion. I can see you can say the religious sign does or at least should initiate the same discussion on issues that are certainly of the same importance, if not more. But it seems to me you're forcing us into making a very wooden distinction that could result in a proliferation of signs for birthday parties, for every conceivable event that could be up for five months. But I think the problem is there already is that here because we have an unlimited number of political signs. And so if the streets are already littered and an unlimited number of political signs, which they are, then how serious is the town's interest to reduce clutter? And I think that's the problem. The way to reduce clutter is to say, for example, many different ways. You can only have one sign per block, five signs total. It can only be a certain size. But it's hard to take the interest seriously of reducing clutter when it allows political signs to clutter the entire town in an unlimited number for the entire year. The church's signs or an event signs are not the problem. What we have here is carte blanche authority for political signs to clutter the landscape in an unlimited number for the entire year, and yet the concern is for maybe a few more signs that may be placed. Alitoson Can the town say that signs relating to a one-time event, an election or anything else that occurs on a particular date have to be taken down within a period of time after that event? And if it can say that, isn't that content-based, the way you define that content? I don't believe it is. In fact, the Washington, D.C. municipal regulations have that exact code, and it's one that we would recommend to the Court. I believe it's 13605. And what it says is all temporary signs should be treated the same, period. You can put you have to put your date on the sign for when you put it up. Every temporary sign can be up for 180 days. If it's tied to an event after the event is over, it needs to be down 30 days after the event. I think our opinion is the reason that's content-neutral is whenever something is over, if your store is closed, the event is done, then the sign can be removed. But the important part is every sign can be up for the same amount of time, even if it is that event that's over now. And I think that's the way you deal with these little things. Alitoson I thought you said the way you distinguish between temporary signs and permanent signs is based on the nature of the sign, not what it says. So that gets you over the problem Justice Sotomayor mentioned about having to read the sign. But if there's a rule that says the sign has to be down within a certain period of time after the date of the event, which is on the sign, I don't see how you get around reading the sign. Well, what you would be reading is the date, and the code requires the date to be placed on the sign, both for when the sign is placed and for, you know, for what the event is. But I think so if somebody puts up a sign for a yard sale, two days before the yard sale, then that can stay up for 48 days after the yard sale. It has 50 days or whatever the period of time is? Yes, according to the code. But what's interesting, that time period can be anything the town desires. It doesn't need to be – and we're not looking for signs all year long. The town can say, for example, temporary signs can be up for 7 days. They can be a certain size. Like Washington, D.C. does, you can only have three signs per block have to be spaced out. And that's part of our point. And I think one of the things to take a look at is the amici brief that's been filed on behalf of the town by the National League of Cities. And the reason that brief's important, for example, on page 10 and 13, it lists dozens in page 10 of the amici brief on behalf of the National League of Cities on behalf of the town. And the reason I point out this brief is, we don't believe that a content-neutral regulation would tie the hands of the town, because as they say, there are dozens and dozens of ways to regulate signs on a content-neutral way. For example, and this has to do with permanent signs. What page is this again? This is page 10 on the National League of Cities amici brief. It says you can regulate locational criteria, off-site signs, number of signs, spacing, setbacks, placement criteria, roof sign, ground signs, wall signs, projecting signs. And all my point is, if you look through their brief, there are innumerable ways for the court, excuse me, for the town to regulate signs. There's no reason to look at the content of the sign, and the reason is, the content of the sign affects the government interest of safety and aesthetics in the same way. If you have, for example, clutter, whether it's the church's sign or a political sign, it's going to clutter the roadways the same way. So the way to deal with clutter is an easy rule, and in fact, even the town concedes that the content-based test that this Court has used and that the majority of the circuits now use in the sign context. The First Circuit, the Second Circuit, the Eighth Circuit, and the Eleventh apply this test to sign codes. And what they say, it's actually easier for the town, because you don't have to. Breyer, what about there are vast areas of the country where there is scenery, and people want to keep the scenery the same, and they don't want signs at all? But they don't want to say no signs, because someone wants to put up a sign that says Geronimo is buried 50 feet away from here. Now, if they say, okay, we'll make an exception for that, does that mean that they have to have an exception for everything, and pretty soon the entire State of Wyoming is just filled with clutter? I wouldn't say everything, but what I would say is content-neutral categories, but they can say, for example, each person could be. Breyer, no, no, it's not a content-neutral category. What it is, is it is a category that says, if you want to say Geronimo is buried here, you can, because that will bring people to look at the grave. And that's it. We don't want anything else. We're trying to keep the place looking nice. Now, that's not a city. Cities are filled with clutter anyway, at least most parts. But that's a so what is, I'm trying to drive it, what is your definition of content-neutral? Which is something that I wonder, since I think the entire U.S. Code is filled with content distinctions. All of crime is filled with content distinctions. All of regulation has content distinctions. So what is it precisely in respect to the content-neutral rule that is consistent with the U.S. Code and is consistent with the example, if any, that I gave? The definition we would propose is the same one this Court has used since the Mosley case about what is content-based, and that is, if the restriction or the regulation looks at the subject matter, looks at the subject matter. No, try the criminal code in solicitation, where if you solicit for certain things, you commit serious crimes. And if you commit certain or solicit for certain other things, they are less serious and so forth. We all know that. How does your definition apply there? Or how does it apply, you see, I'm confused. I understand the words, but I just have never been able to understand how they apply in many cases. Only limited here to free speech questions, not criminal laws, not. No, no, I'm sorry, there's a free speech question under criminal law. Does the First Amendment permit solicitation of drugs to be punished less or more serious? You understand what I'm driving at? I do. Because of the U.S. Code. I do, but I think. What I want and hoping for is enlightenment. I think if there's – if it's a conduct-related offense, we don't get into free speech. If there is a free speech offense, even under the code, I believe this Court's cases say, for example, there are vagueness cases where there are criminal laws. This, in fact, is a criminal law. If you continue to put up your signs, you could actually get fined and jail time. So I believe the First Amendment would also apply if it's speech-related. In answer to your hypothetical, I think there are many ways for the locality to regulate those signs. For example, if it doesn't want many signs, it can say one person can put up a temporary sign or a permanent sign or whatever have you. But to say, for example, you can put up a private sign because you think this one location is interesting, what if another person has a location they want people to come visit? Should the government be able to say, well, we think your location is important, but your location is not? And our response is the government could put up the sign if it wants to make that choice about historical landmarks or other types of signs or directional types of signs. I'd like to reserve the remainder of time for rebuttal, if I may. Thank you, Mr. Courtman. Mr. Fagan. Thank you, Mr. Chief Justice, and may it please the Court. We agree with petitioners that Respondent's ordinance here is unconstitutional. We think that a context-specific intermediate scrutiny approach should apply in evaluating speech permissive exceptions to a sign ordinance where those exceptions are based on the same longstanding traditional rationales that justify the sign ordinance as a whole. A wooden application of strict scrutiny in this context would suggest that it's presumptively unconstitutional, for example, for a town to limit signs on public property but have an exception if you want to paint your street number on your curb. Now, that doesn't make a great deal of practical sense, and that's not an example I just made up. That's essentially the ordinance this Court upheld, albeit without specifically addressing this particular issue in Taxpayers for Vincent. On a theoretical level, the normal reasons for deep judicial skepticism of exceptions to a regulation of speech don't apply in the context of that street address exception, exceptions for danger or safety signs, or other types of exceptions that track the normal safety and nonproliferation rationales for a sign regulation. Those kinds of exceptions don't create any inference that the government is attempting to favor one viewpoint or another, that it's trying to limit the set of ideas that are going to come into the public marketplace, or that it doesn't truly believe in the safety and nonproliferation rationales that underlie the sign regulation as a whole. Roberts. Well, I mean, you obviously know the difficulty with that, which is how does the government decide when there should be an exception, or how does a court decide when there should be an exception and when there shouldn't be? I mean, I understood the whole point of the strict scrutiny for content-based restrictions is to find out which are the types of speech or the particular types of regulation that should be given an exception, rather than starting with saying, well, you don't apply the scrutiny because there ought to be an exception. Well, I think the main problem with strict scrutiny in this context is it sends a signal to legislatures that they're on safer ground if they enact a broad and undifferentiated restriction on signs than if they try to tailor it only to those types of signs that actually cause the problems they're trying to prevent. And I think the way that the Court can manage the situation is to see whether, under intermediate scrutiny, there really are safety or nonproliferation rationales that track on to whatever exception is being drawn. So if I could use, for example, Justice Sotomayor's example of the for sale signs. A town might permissibly have an ordinance that limits the number of signs you can have on your lawn to two, two signs of any type. But it might also say, you know, we're not going to count for sale signs against your quota of two. And the reason is that for sale signs are only up in a very small percentage of properties at any given time. They're up for a very limited purpose when the property is for sale, and they go down once the sale is consummated. Scalia. And you want us to sort these ordinances out one by one? And examine each of these exceptions and say, you know, this is okay and this isn't okay? I don't know that the Federal judiciary is numerous enough to do that. And it's a much more simple rule that the other side presents. Treat all signs the same. If clutter is the problem, they all clutter. And you shouldn't allow or disallow on the basis of the message. Well, Your Honor, it's a simple rule, but I think it's an extremely impractical rule that is going to foreclose experimentation and local solutions to local problems. Let me give you another example of a town that has some sort of sign restriction, but it doesn't apply that sign restriction to safety signs like children at play or hidden driveway ahead. If you're going to apply strict scrutiny to those kinds of exceptions, they're probably not going to pass muster unless it's a really watered-down version of strict scrutiny that I think is unfamiliar to the courts. There's actually a fairly robust protocol. Scalia. What's the problem? You make your sign limits big enough that those signs will attract attention. That's all. Well, I think towns legitimately should not have to be put to the choice if they want to prevent the proliferation of signs that would cause safety problems. Or have the town put up the signs, in which case they can be as big as the town wants. We're just talking about private signs here. Your Honor, I'm not. So you're saying every private individual has to have a big sign, children at play, right? Well, I don't want to resist too hard the idea that the government can put up any signs it wants, but I think the reason we think the government could put up the signs here is not because the government can say that it can speak on certain topics and private citizens can't, but because of the nature of the signs that are being put up, which means that some work has to be done here by the fact that the types of signs I described are safety signs. Now, if we're going to subject that kind of exception to strict scrutiny, it turns out there's actually a fairly robust empirical debate about whether children at play signs or hidden driveway ahead signs actually do enhance safety. And courts are going to have to make a one-size-fits-all conclusion about whether the state of the evidence, which right now is fairly equivocal, justifies that sort of exception. I think courts are likely to do that. Roberts, I'm not sure your whole approach is not precluded by our decision in McCullen. There we said that a facially neutral law does not become content-based simply because it may disproportionately affect certain types of certain topics. And we said the question in such a case, in other words, when you're dealing with a facially neutral law, is whether the law is justified without reference to the content. So it seems to me that you've got to get over the content neutrality. Your argument only applies when it's content neutral, and yet here we're dealing with a situation where you're saying it's an exception to the content-based rule. Well, Your Honor, I think the Court can deal with the competing interests in this case more easily, not by getting bogged down in the definition of content-based and content-neutral, which I can address in a second, but by focusing more on the bottom-line question of whether this is an appropriate case for the application of strict scrutiny or intermediate scrutiny. Ginsburg-Miller When you use those labels in the context of the First Amendment, do they mean the same thing that they mean in equal protection? That is, intermediate scrutiny is a pretty tough standard in equal protection. Well, I think there are a couple of flavors of intermediate scrutiny, both under the Constitution at large and under the First Amendment in particular. I think here we'd be urging something more like a reasonable fit test, which we think would give municipalities enough room to draw the kinds of distinctions that I think they reasonably should be able to make between painting your street number and your street number and saying, hey, you know, you can't possibly find your house, and restrictions on, you know, particular types of speech that are much more likely to be motivated by disagreement with that speech. We do think that intermediate scrutiny has a fair amount of teeth in the circumstance, and we're putting our money where our mouth is because we think that the particular ordinance at issue here fails intermediate scrutiny. But intermediate scrutiny would give municipalities enough room to draw these kinds of distinctions and to draw, in particular, the kinds of distinctions that are drawn in the Highway Beautification Act, which allows certain types of signs that do enhance safety and aesthetics, but generally doesn't allow the ground on the sides of freeways to become a breeding ground for signs, which would decrease driver safety and decrease appreciation of traffic. Sotomayor, do you think that a do you think that a, a library could set up a freeway that would allow, say, big books are preferable to little books, and it so happens that big books are coffee books and little books tend to be mostly political. So we're going to put all the political books in the basement and all the big books on the main floor. Is that a distinction that the First Amendment permits? I think a court might be reasonably, fairly skeptical of that kind of distinction. But I think signs, Your Honor, present particular First Amendment problems that the Court had to grapple with and didn't quite resolve in Metro Media and City of Ladue. One distinct problem with, with signs is that the — it's very difficult for legislatures to tailor sign regulations and describe types of signs that it doesn't think it needs to regulate to advance its interests, thereby allowing more speech, without describing those types of signs in a manner that could be viewed as content-based. And that's what makes sign regulation very difficult and why we think some sort of context-specific rule in this circumstance would be appropriate. Scalia, I don't see why. I mean, you say it, but why is it true? Just, just make whatever the sign requirement is big enough that any private signs that, that need to get people's attention will get people's attention. Well, I think you're really— And what do you say about signs? I assume applies to noise as well, right? If a city has a noise ordinance, it can distinguish between noises for various purposes, a political sound truck before an election can be given a higher allowance and, I don't know, a street evangelist given a lower allowance? I don't think that would be permissible, Your Honor. I think one key here is that the types of exceptions we're talking about, the only types we think should be subject to intermediate scrutiny, are ones that track the safety and nonproliferation rationales for the sign ordinance as a whole. If the city is advancing a distinction based on the fact that they think political speech or ideological speech is more valuable than, say, religious speech, we think that would be subject to strict scrutiny. Thank you. Thank you, counsel. Mr. Sabrin. Mr. Chief Justice, and may it please the Court. The problem with applying strict scrutiny in this case, or this type of case, is that it will have, we believe, the opposite effect. It will limit speech because towns, cities will enact one-size-fits-all. In order to do that, as Petitioner's counsel indicated, there need to be limitations on the number of signs, on the duration of signs. The signs would have to be all large enough to accommodate the largest message that needs to be communicated. And in order to pass strict scrutiny, the legislatures in these towns and cities across this country would be inclined to ban all signs except those that the First Amendment absolutely allows. But you can make that argument in all kinds of contexts. I don't know where it gets you. Suppose that the question is whether we're going to — whether the town is going to allow anybody to speak in a park. And the town — the town counsel says, well, you know, we would like to have people be able to speak on subjects that we like, but there are some subjects we really don't like. We don't want people to speak on those. So we have the choice. We allow everybody to speak or we allow nobody to speak. So you can make exactly that same argument in lots of other contexts where I don't think the distinction could be justified. Wouldn't that — isn't that right? I think there's a difference, Justice Alito, in signs as opposed to speech, because signs do take up physical space. They displace other uses of land. And they perform different functions. One thing that we would like to emphasize in this case is that the temporary directional sign provision is limited to — in signs that are intended to guide travelers along a route from point A to point B. If they have expressive content on them, then they are no longer a directional sign, but are then an expressive sign, and there's a different provision that applies for that. So if a sign here said, we welcome you to attend our church service, and then it says on the bottom, meeting place, and it specifies the meeting place. But the message is, we welcome you to attend our service. That's ideological? That is ideological. That would not be a directional sign because it's not directing travelers along a route. But it says also, we welcome you to attend our church service. It will be held at. So it's giving the direction, but it's also expressing the message that everyone is welcome to come worship. I believe the way that this code has been interpreted, Justice Ginsburg, is that that would not be a directional sign because it's not saying turn right, turn left, go straight a few miles. It's not giving directions about how to get there. So I believe that that type of sign would be permitted under this ordinance as a ideological sign, and would not be limited to the terms of the temporary direction. Kagan. Kagan. Could I ask what your justification is for these specially generous provisions on ideological signs? I mean, putting aside the level of scrutiny, just why do you have these very generous rules for ideological signs as compared to others? Well, specifically on the ideological signs is to protect the First Amendment right of anyone to speak on any topic at any time. The difference in the ---- So you're not even purporting to have a content-neutral justification for this. You're essentially saying, yes, we generally dislike clutter, but we're willing to make exceptions for clutter for speech that we think has special First Amendment significance. That would not be our position, Justice Kagan. Our position is that it's not content-based in a constitutional sense for purposes of applying strict scrutiny, that the distinction is permissible here without relation to the content or in terms of favoring or censoring certain viewpoints or ideas, because ---- Well, viewpoint discrimination is quite different from content discrimination. And you're trying to reduce our rules against discriminating on the basis of content to a rule against viewpoint discrimination. Not just viewpoint. I mean, ideological signs, that is a content category. And there is as much a First Amendment right to give somebody directions as there is to speak about being green or whatever else. Is there no First Amendment right to give somebody directions? Justice Scalia, we would say that the ---- they perform different functions. It certainly ---- They sure do. But is there a First Amendment right for these other messages or not? I think they would have a right to speak. And I think that they do have that right to speak, and that intermediate scrutiny applies to regulations about how speech can be communicated as opposed to what can be communicated. But you did say in your brief that the First Amendment does not require directional signs, so they could be banned altogether. I think if it's narrowly tailored and meets the intermediate scrutiny test in a particular jurisdiction, then ---- Well, that's a lot of words. I'm giving you an example. The law says no directional signs. That's the law. Does that ---- does that offend the First Amendment? I think that it ---- well, when we say offend the First Amendment, I think you would have to apply the intermediate scrutiny analysis, and our position would be that it would ---- that it could survive that analysis. If I could return to Justice Kagan's question about the interests that are served, it's different. A directional sign, there needs to be more of them in order to direct travelers along a route, so that justifies a ---- perhaps a smaller size. There's no contention in the record. In fact, the court of appeals found that they function as intended. As far as the duration is concerned, there's no travelers going to an event that is not presently occurring. In fact, the town of Gilbert expanded the time frame from 2 hours to 12 hours, and I ---- our question is whether or not that's something that implicates First Amendment jurisprudence. Breyer, you say on ---- suppose we're talking about the context of signs, and say, well, let's look to the purpose of forbidding any prohibition, and I guess it has to do with safety or beautification. Yes. Breyer, that's it. First question would be, is there some category that you don't allow to put up signs? Answer, no. Everybody can put up signs. So what about applying strict scrutiny to that? If you're going to distinguish on the basis of what the sign says, you have to have an awfully good reason if your decision is you can't put one up at all. Next, you put them up. But you have all content, all kinds of distinctions, how, how long, et cetera. Now, in respect to that, maybe you should have more leeway, leeway depending upon the purpose of the sign. So if, for example, it's about an open-air municipal movie, you could say put up signs about movies or something. I mean, you know, maybe you have more leeway there. But still they're saying you'd flunk even that test here because there isn't really a very good reason at all in this case for making the sign smaller or for putting it there for such a short time. Now, how do you react? There are three parts. One, very tough if you're going to say you can't put it up at all. Sometimes called strict scrutiny. Two, somewhat more lenient if it gets up, but you're trying to distinguish among how and under what circumstances, how long. And then three, do you even satisfy that one? That's called time, place, and manner, the second one. Yes, okay. Well, with respect to the first one, the interest most of the times in sign ordinance regulations, as you've indicated, is aesthetics and safety. With respect to aesthetics, don't believe that that would meet the definition of a compelling interest so that it's automatically, presumptively, and conclusively unconstitutional if the strict scrutiny is applied and that's the – and there's no compelling interest. With respect to the interests at stake here, we again believe that directional signs are functionally different from an ideological sign or even from a political sign, that the directional signs do not need to be larger and also that there are more of them. And so if there are more of them, the tradeoff is, at least the legislature in this town has decided, the tradeoff is that they need to be smaller because they need to guide travelers along a route. And political signs are there almost all year on the rights of way. You talk about clutter. What if somebody doesn't like politics and he says politics is spinach? I want ideology. I would like ideological signs on the right of way. You say, I'm sorry, you're wrong. We think politics is more important because we're politicians and we're on the city council. I have two responses to that, Justice Scalia. The first one is that there is a statute in Arizona that this ordinance complies with in terms of the placement, the duration, and the size of the political signs. The town doesn't have any leeway in that because it needs to comply with the statute. Does the State statute have the same size and duration? The State statute says you have to allow political signs, but does it specify the size and the duration? Yes, Justice Ginsburg, it does. So you're saying that the town ordinance just mirrors the State? Yes. Yes, it does. And do you have that State law? I do. It's section 16-1019. So your defense to a First Amendment complaint is, what, the State made me do it? Well, our defense, well, in part, yes, because we need to comply with the statute and it doesn't make sense that, as a result, all signs need to be, meet those provisions. For purposes of preserving beauty, reducing clutter, so on and so forth. It makes a lot of sense if you believe in the First Amendment. Well, I'm not going to. If you believe that neither the State nor the City is entitled to say politics is really important, as opposed to music. The other consideration here, Justice Scalia, is that we're talking about public property. And one of the issues that has not been developed, certainly in the record in this case, at this Court, is the extent to which the government can select subject matter for what is a nontraditional public forum. So there are issues as well that would need to be developed a little further before any application of intermediate scrutiny, we say, could be continued on, if the Court were to find problems with the Ninth Circuit's application of intermediate scrutiny. And I think that there would still be some issues on location that would need to be developed on the public forum, and that is removed. You say the street is not a traditional public forum? That is the, certainly, Gilbreth's position. It was something that was argued in the Ninth Circuit. The Ninth Circuit did not resolve that issue. But I believe that would be a question of Arizona law. But again, we have not developed that, and that issue has not been developed in this, at this, in this Court. And I think the reason is because the issue in this Court is whether or not strict scrutiny applies. Alito, how do you justify the differing treatments of Petitioner's sign on the one hand and the weekend builder event signs and the Homeowner Association signs? The Homeowner Association sign can be 80 square feet, and the Petitioner's sign can be 6 square feet. The Homeowner's signs are not really directional signs because they can only be within the residential community. They are not directing travelers off-site in a generic sense to a location. There's also a permit requirement. And the other thing is about the 80 square feet is that's total sign area. That's not one sign. That's the total sign area you can have. Has anyone ever been denied one of those permits? I don't know the answer to that question, Your Honor. Suppose Petitioners want to put up a sign that says we're having a church service at 10 o'clock on Sunday morning. Under your code, when can they put that up and when do they have to take it down? They could put it up 12 hours before, so that would be 10 o'clock p.m., and they could take it and they take it down, I believe it's an hour afterwards. So they can put it up after dark on Saturday and then they have to take it down within an hour after when? The commencement of the service or? The end of the event. The end of the? The end of the event. Do you think that really gives them an opportunity to invite people to come to their service? The purpose of these signs is not supposed to be invitational. It's supposed to be directional. If the event was occurring at 10 o'clock at night or at 6 o'clock in the evening, it could be up during the day. If the event occurs all weekend long, it could be up all weekend long. It's tied to the event. So in that sense, it absolutely serves its purpose for having on the 12 hours before, because if they want to invite members of the public to the services, they can and do have many other opportunities and alternatives, including signage, including the ideological sign that they can use. So they could put up a quote, unquote, ideological sign that says, come to our service on Sunday morning, but no arrow, and then they put up another sign that says this is the arrow, or maybe they put up in the first sign, come to our service on Sunday morning. We can't tell you now where it will be because the town won't let us, but if you come, if you drive by here tomorrow morning at a certain time, you will see an arrow. The sign could say, Your Honor, where it is taking place, but if it's intending to guide travelers to that location, then it would need to comply with the provisions. And there is the reason it can't. Ginsburg. What is the guidance? I'm looking at the Good News sign on page 3 of the blue brief. It just has an arrow. It says the name of the elementary school, and then it has, looks like, a telephone number and an arrow. The arrow is the direction. This doesn't – this is not, as you described earlier, turn left on Main Street and turn right on Front Street. It is the same function as that. We would say the arrow. Just what is this about, this argument? I mean, you agree they can put up a big sign, can they put up a big sign, ideological saying, come to the church service next Tuesday, 4th and 8th Streets, three blocks right and two blocks left. All right? Or are you saying they can't say three blocks right and two blocks left? And that's what this argument is about? That's what it comes down to. Well, my goodness. I mean, on that, it does sound as if the town is being a little unreasonable, doesn't it? Well, we would say that the sign has an, what this Court has termed an incidental effect on the expression of the Petitioners, that certainly they can have the ideological sign, the information that they want to include. Suppose we said this, that we're in fact, the argument is of this nature, we're in fact, there are, you can have a big sign and have everything on it except an arrow, and the purpose of the sign is in fact to tell people both what's happening and where, that there is no good under any test reason for requiring them to have this little dingy thing. Under the case. Well, Your Honor, our response to that, Your Honor, is that the directional signs in order to work need to guide travelers along a route, so there's going to be a whole lot of these signs in order for them to function as intended. It can be a mile away, it can be two miles away. So having just one sign, perhaps under the course hypothetical, it seems rather silly, but if you're thinking about having a whole bunch of these signs over a long distance, then I think then that's. There's good news, there's the good news, Church, have a number of signs, this, this illustration, how many signs do they have? I believe the number is 15, but I'm not 100 percent sure about that, Your Honor. I know that they have quite a few. Can you see that car when you pass, can you see that sign at all when you pass? I'm sorry, Your Honor? Can you see the sign at all when you pass in a moving car? Yes. In fact, the court of appeals has found that it, that it functioned as intended and there's no indication that it did not. So there's – it seems to me that those are the kind of decisions as far as size, duration, are ones that should be the fodder of legislative deliberation. And as long as it meets the intermediate scrutiny test, it should be constitutional muster. Whatever that is, right? Well, the intermediate scrutiny test, I think, is if it's narrowly tailored and also if there are alternative modes of communication. But I think that applying strict scrutiny to these types of regulations will result in sign ordinances being struck down uniformly, just about. And the only speech that will be allowed will be speech that is constitutionally required. Everything else will not be. I think the problem, if there is one, that Gilbert has gotten into is that it allows a lot of speech that a lot of other ordinances might not in a lot of different formats. Just again, if I could understand, let's even assume that intermediate scrutiny applies. And just focusing on this special provision for ideological speech, which allows very large signs to stay up as long as possible, and you would say we're making that exception, if you will, to the general rule that there shouldn't be clutter and there shouldn't be a lot of these signs, because why? Because directional signs. No, no, no. I just asked you for the exemption for ideological signs, for the specially generous provision for ideological signs. Why do ideological signs get such generous treatment? Because the to protect the First Amendment right to speak. Okay. So that is a content-based rationale. And then, you know, on one theory, you lose regardless of what the standard of review is. If the article You're not justifying it on the grounds of safety or on the grounds of clutter. You're saying this is a special kind of speech that we think there ought to be more of. With respect to the ideological sign? Yes. Yes, the purpose of that is it is content-neutral in terms of anything can be on that sign. And we're saying No, so that goes back to what Justice Scalia said. It's viewpoint-neutral, but, you know, it's content-based. And maybe you're just saying that we've run amok on this content-based distinction, and there would be an argument there. But, I mean, it is content-based to say what's ideology and what's not. And I would agree that that's what we're arguing, Your Honor, that what we're saying is that the First Amendment is guards against the abridgment of speech. And having a rigid content definition to be the on-off switch for whether strict scrutiny or intermediate scrutiny applies is not workable, does not achieve common-sense results. It handicaps the legislatures and their ability to be flexible. Well, maybe you think that, but the guy who doesn't like politics and likes ideology doesn't think that. Well, the person I mean, so we're supposed to sit here and say, oh, political speech is the most valuable, and you can allow that, but ideological speech comes in a close second, and then what? Then directional speech or whatever else? Well, I don't want to do that. I don't think you should want any governmental official, even a judge, to do stuff like that. Your Honor, I think for purposes of ruling in this case, I think the question is whether or not the temporary directional sign is subject to its content-based in a constitutional sense such that it would be subject to strict scrutiny. We believe that that would be improper. We think that it would be against the jurisprudence of the Court. It's content-based in a constitutional sense, as opposed to content-based in a non-constitutional sense. Whether it puts the finger on the scale of ideas or viewpoints, whether the substance of it, whether it favors That's viewpoint-based, not content-based. Well, whether it favors or censors If you want to eliminate content-based as the criterion and make it viewpoint-based No, Your Honor, that is not what we're advocating. What we're advocating is that if an ordinance does not got – if an ordinance addresses the function of the sign as opposed to the particular ideas or even the subject matter, then it would not be content-based for purposes of Is there a difference between the function of the sign and the content of the sign? Yes, Your Honor. I frankly can't grasp that. What is it? Well, it depends on how Does its function depend upon its content? In a literal sense, yes. Oh, I see. What sense are we talking here? Well, both Poetic? No. We think that there needs to be a nuance, as the Federal Government has indicated, so that it guides – the content test is a guide for courts to determine which level of scrutiny applies. And at some level, if content is the on-off switch, then such distinctions as temporary and permanent, commercial and noncommercial, even on-site and off-site, are going to be content. And we don't believe that that in and of itself justifies strict scrutiny. Thank you, Your Honor. Thank you, counsel. Mr. Cortman, you have four minutes remaining. Thank you, Mr. Chief Justice. Just a few quick points in response, if I may. A clarification point on the State statute. First of all, when this case began, the State statute was not in effect, and political signs were actually allowed up for longer than the period of time when the State statute was enacted. It actually lessened that time, so it's not the State's doing that the town decided to allow political signs in its right-of-way. But even with the State statute, if the State has decided that its interest in free speech and political signs outweighs the interest in safety and aesthetics, then the town should basically adopt an ordinance that abides by that. And the simple way to do that is to treat it as a constitutional floor. If the State has decided that we're going to allow political signs up for that period of time, and by the way, the statute doesn't mention other signs, so it's not a restriction like this town code is. All it says is we've deemed it important enough for political signs to be up for 60 years. It's just permissive for political signs. That's right. And so the response by the town is, okay, if that's the case, and the State has decided that political signs outweigh our interest in safety and aesthetics, the way we deal with that is treating other similar signs the same. I think a couple other points. The noise ordinance is a perfect example, whether it's the side case or the Kovacs case. This ordinance would be akin to allowing, for example, political speech to be much louder in decibels and for longer periods of time, and someone on the street corner inviting someone to church must be quieter and for less periods of time. And quickly, if I may address the safety and beautification interest, they are certainly important interests, but as this Court said several times in Cary v. Brown, for example, and Discovery Network, the distinctions, the content-based distinctions in the code bear no relationship to the government interest. The distinctions don't advance those interests. And as to being under-inclusive, I think it's similar to what this Court found in Discovery Network. When there, the town wanted to prohibit 62 news racks and then allow 1,500 to 2,000 news racks to remain, this Court said that was under-inclusive and would fail just on that. Here, the town is allowing an unlimited number of political signs, but then prohibiting just a few other signs. Thank you. Roberts. Thank you, counsel. The case is submitted.